1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7    JACOB MCGRATH,                          Case No.  19-cv-05279-EMC

8                    Plaintiff,

9         v.                                 **ORDER GRANTING DEFENDANT'S
                                             MOTION TO COMPEL
10   DOORDASH, INC.,                         ARBITRATION**

11                   Defendant.              Docket No. 116

12

13

14         Plaintiff Jacob McGrath has filed a FLSA collective action (nationwide in scope) against

15   Defendant DoorDash, Inc.  As of date, counsel for Mr. McGrath has filed approximately 4,000

16   consent forms.[1]  Currently pending before the Court is DoorDash's motion to compel arbitration.

17   Specifically, DoorDash asks that the Court compel arbitration for the vast majority of individuals

18   who have filed consent forms and thus joined the litigation; the only exception would be for those

19   persons who validly opted out of arbitration per the terms of their applicable arbitration

20   agreements.

21         Having considered the parties' briefs and accompanying submissions, as well as the oral

22   argument of counsel and all other evidence of record, the Court hereby **GRANTS** the motion to

23   compel arbitration.

24

25   _____

[1] There has not been preliminary certification of a collective as of yet.  However, that does not bar
26   individuals from opting into this lawsuit now.  *See Campbell v. City of Los Angeles*, 903 F.3d
     1090, 1101 (9th Cir. 2018) (noting that "'[t]he sole consequence' of a successful motion for
27   preliminary certification is 'the sending of court-approved written notice' to workers who may
     wish to join the litigation as individuals"; but workers may join litigation even before preliminary
28   certification – i.e., "preliminary certification is 'neither necessary nor sufficient for the existence
     of a [collective] action'") (emphasis omitted).

United States District Court
Northern District of California

## I.      FACTUAL & PROCEDURAL BACKGROUND

A.      Second Amended Complaint (SAC)

In the operative SAC, Mr. McGrath alleges as follows.

DoorDash is a company that "provides takeout food delivery via a phone application and website."  SAC ¶ 1.  The persons who deliver the food are known as "Dashers."  *See* SAC ¶ 1.

Mr. McGrath began working as a Dasher in October 2018.  *See* SAC ¶¶ 4, 19.  He opted out of DoorDash's arbitration agreement in November 2018.  *See* SAC ¶ 6.

According to Mr. McGrath, DoorDash has misclassified the Dashers as independent contractors rather than employees and thus has "fail[ed] to pay them for all hours worked."  SAC ¶ 1; *see also* SAC ¶ 30 *et seq.* (making allegations regarding "economic realities").  Mr. McGrath charges DoorDash in particular with failing to pay a minimum wage.  Mr. McGrath has offered several theories as to how DoorDash failed to pay a minimum wage:

(1) Mr. McGrath typically worked a 15-hour workweek and was paid delivery fees of approximately $60; thus, his hourly rate amounted to $4, which is below both the federal minimum wage ($7.25/hour) and the California minimum wage ($12.00/hour).

(2) DoorDash only counted as working hours the time spent driving between a restaurant and a customer's location; it did not compensate Mr. McGrath for the time he spent driving to restaurants and then waiting for food orders to be completed.

(3) DoorDash did not reimburse Mr. McGrath for business expenses such as the $100/week he spent on average for gas; this effectively lowered his wage.

B.      Arbitration Agreements

In support of its motion to compel arbitration, DoorDash has provided the following evidence.

In order for an individual to work as a Dasher for DoorDash, she is required to sign up for a DoorDash account.[2]  Although the sign-up process has varied somewhat over time, the following is representative of the process.  *See* Tang Decl. ¶ 10.

_____

[2] Implicitly, an individual signs up through DoorDash's mobile app or its website.  *Cf., e.g.*, Tang Decl. ¶ 4 (testifying that Dashers receive delivery opportunities through the DoorDash app).

United States District Court
Northern District of California

United States District Court
Northern District of California

To sign up for a DoorDash account, an individual enters her email address, phone number, and zip code on a sign-up screen.  *See* Tang Decl. ¶¶ 6, 10 & Ex. F (sign-up screen).  The bottom half of the sign-up screen includes the following statement with a check box next to it:

> ☐ I consent to receive emails, calls, or SMS messages including by automatic telephone dialing system from DoorDash to my email or phone number(s) above for informational and/or marketing purposes.  Consent to receive messages is not a condition to make a purchase or sign up.  I agree to the Independent Contractor Agreement and have read the Dasher Privacy Policy.

Tang Decl., Ex. F (sign-up screen) (red text in original); *see also* Tang Decl. ¶ 10.  It appears that the red text provides hyperlinks to the Independent Contractor Agreement ("ICA") and Dasher Privacy Policy.  *See* Mot. at 2.  At the very bottom of the sign-up screen, there is a "Sign Up" button.

Before agreeing to the ICA and signing up, an individual can scroll through the ICA without any time constraints.  If she wishes to proceed with the sign-up process, however, she must manifest consent to the ICA by clicking/checking the box and then clicking the "Sign Up" button.  If the individual clicks the "Sign Up" button without clicking/checking the box, she receives a message that states she must accept the ICA in order to continue.  *See* Tang Decl. ¶ 11 & Ex. G (sign-up screen with message "You must accept this agreement to continue!).

DoorDash has had five different ICAs over the years (from 2014 through the present).  *See* Tang Decl., Exs. A-E (ICAs).  The most recent ICA went into effect on November 9, 2019.  *See* Tang Decl. ¶ 8.  When Dashers logged on to the DoorDash platform on or after November 9, 2020, they were given notification of the "Updated Terms and Conditions Agreement."  *See* Tang Decl. ¶ 12 & Ex. H (Updated Terms and Conditions Agreement).  To proceed, the Dasher would have to check a box next to the phrase "I have read, understand, and agree to the Independent Contractor Agreement."  *See* Tang Decl. ¶ 12 & Ex. H.  "Existing [Dashers] could not continue using the DoorDash platform unless they agreed to the updated terms contained in the November 2019 ICA."[3]  Tang Decl. ¶ 12.

---

[3] DoorDash has filed a supplemental declaration (which the Court permitted), *see* Docket Nos. 187, 189 (motion and order), explaining that Plaintiffs have provided email addresses for about

United States District Court
Northern District of California

1    Starting in September 2016, the various ICAs included the following as the second

2    paragraph in the agreement:

3    **IMPORTANT: PLEASE REVIEW THIS AGREEMENT**
**CAREFULLY.  IN PARTICULAR, PELASE REVIEW THE**
4    **MUTUAL ARBITRATION PROVISION IN SECTION XI, AS**
**IT REQUIRES THE PARTIES (UNLESS YOU OPT OUT OF**
5    **ARBITRAITON AS PROVIDED BELOW) TO RESOLVE**
**DISPUTES ON AN INDIVIDUAL BASIS, TO THE FULLEST**
6    **EXTENT PERMITTED BY LAW, THROUGH FINAL AND**
**BINDING ARBITRATION.  BY ACCEPTING THE**
7    **AGREEMENT YOU ACKNOWLEDGE THAT YOU HAVE**
**READ AND UNDERSTOOD ALL OF THE TERMS,**
8    **INCLDING SECTION XI, AND HAVE TAKEN THE TIME**
**AND SOUGHT ANY ASSISTANCE NEEDED TO**
9    **COMPREHEND THE CONSEQUENCES OF ACCEPTING**
**THIS AGREEMENT.**

10

11   Tang Decl., Ex. B (first page, second paragraph of ICA) (capitalization and bold in original).  This

12   language was also provided as part of the notification described above when the most recent ICA

13   went into effect on November 9, 2019.  *See* Tang Decl., Ex. H (Updated Terms and Conditions

14   Agreement).

15       In addition, starting in September 2016, the various ICAs included the same or similar

16   basic terms (§ XI):

17   • "This arbitration agreement is governed by the Federal Arbitration Act (9 U.S.C. §§

18    1-16) ('FAA') and shall apply to any and all claims arising out of or relating to this

19    Agreement, CONTRACTOR's classification as an independent contractor,

20    CONTRACTOR's provision of Contracted Services to consumers, the payments

21    received by CONTRACTOR for providing services to consumers, the termination

22    of this Agreement, and all other aspects of CONTRACTOR's relationship with

23    DOORDASH, . . . whether arising under federal, state or local statutory and/or

24    common law, including without limitation . . . Fair Labor Standards Act . . . ."

25    Tang Decl., Ex. B (§ XI.1).

26   • "The parties expressly agree that this Agreement shall be governed by the FAA

27

28   3,000 of the individuals who filed consents in this action.  According to DoorDash, the vast
majority of these Dashers are subject to this most recent ICA.

4

even in the event CONTRACTOR and/or DOORDASH are otherwise exempted from the FAA.  Any disputes in this regard shall be resolved exclusively by an arbitrator.  In the event, but only in the event, the arbitrator determines the FAA does not apply, the state law governing arbitration agreements in the state in which the CONTRACTOR operates shall apply."  Tang Decl., Ex. B (§ XI.1).

- "<u>Class Action Waiver</u>.  CONTRACTOR and DOORDASH mutually agree that by entering into this agreement to arbitrate, both waive their right to have any dispute or claim brought, heard or arbitrated as, or to participate in, a class action, collective action and/or representative action, and an arbitrator shall not have any authority to hear or arbitrate any class, collective or representative action ('Class Action Waiver'). . . . [A]ny claim that all or part of this Class Action Waiver is unenforceable, unconscionable, void or voidable may be determined only by a court of competent jurisdiction and not by an arbitrator. . . . All other disputes with respect to whether this Mutual Arbitration Provision[4] is unenforceable, unconscionable, applicable, valid, void or voidable shall be determined exclusively by an arbitrator, and not by any court."  Tang Decl., Ex. B (§ XI.3).

- "**<u>CONTRACTOR's Right to Opt Out of Arbitration Provision</u>.  Arbitration is not a mandatory condition of CONTRACTOR's contractual relationship with DOORDASH, and therefore CONTRACTOR may submit a statement notifying DOORDASH that CONTRACTOR wishes to opt out and not be subject to this MUTUAL ARBITRATION PROVISION.** . . . In order to be effective, CONTRACTOR's opt out notice must be provided within 30 days of the effective date of this Agreement.  If CONTRACTOR opts out as provided in this paragraph, CONTRACTOR will not be subject to any adverse action from DOORDASH as a consequence of that decision and he/she may pursue legal remedies without regard to this Mutual Arbitration Provision.  If CONTRACTOR

---

[4] Section XI of the ICA is titled "Mutual Arbitration Provision."

1    does not opt out within 30 days of the effective date of this Agreement,

2    CONTRACTOR and DOORDASH shall be deemed to have agreed to this Mutual

3    Arbitration Provision.  CONTRACTOR has the right to consult with counsel of

4    CONTRACTOR's choice concerning this Mutual Arbitration Provision (or any

5    other provision of this Agreement."  Tang Decl., Ex. B (§ XI.8) (capitalization and

6    bold in original).

7    The Court notes that, under the more recent versions of the ICA,

8    > contractors may opt out of the arbitration provision within thirty
9    > days after agreeing to the ICA by *mailing* a signed letter to
     > DoorDash indicating that they wish to opt out.  Under earlier
10   > versions of the ICA, contractors were permitted to opt out of the
     > arbitration provision within thirty days after agreeing to the ICA by
11   > sending an *email* to DoorDash indicating that they wished to opt out.

12   Tang Decl. ¶ 13 (emphasis added).

13   Another difference among the various ICAs is that all of the ICAs, except for the most

14   recent version, are governed by the AAA Commercial Arbitration Rules (with certain exceptions).

15   *See, e.g.*, Tang Decl., Ex. D (§ XI) (listing as one exception that "DOORDASH shall pay any

16   costs uniquely associated with arbitration, such as payment of the costs of AAA and the

17   Arbitrator, as well as room rental").  For the most recent ICA (in effect as of November 9, 2019),

18   "[a]ny arbitration shall be governed by the CPR Administered Arbitration Rules and, when

19   applicable, the CPR Employment-Related Mass-Claims Protocol . . . of the International Institute

20   for Conflict Prevention & Resolution" (with certain exceptions).[5]  *See* Tang Decl., Ex. E (§ XI)

21   (listing as one exception that "DOORDASH shall pay any costs uniquely associated with

22   arbitration, such as payment of the fees of the Arbitrator, as well as room rental").

23   The Mass-Claims Protocol states that it applies "[a]ny time greater than 30 individual

24   employment-related arbitration claims of a nearly identical nature are, or have been, filed with

25   CPR against the same Respondent(s) in close proximity one to another."  Pl.'s Ex. 3 (CPR Mass-

26   Claims Protocol at 2).  Under the Protocol, claims are randomly assigned numbers.  In general, the

27

28   [5] CPR is a 501(c)(3) not-for-profit organization formed in 1977.  *See* Holocek Decl., Ex. E (CPR
     responses to subpoena in *Abernathy v. DoorDash, Inc.*, No. C-19-7545 WHA (N.D. Cal.)).

United States District Court
Northern District of California

claims numbered 1-10 "will be the initial Test Cases to proceed to arbitration."  Pl.'s Ex. 3 (CPR

Mass-Claims Protocol at 2-3).  In general, these claims will be resolved within 120 days of the

initial pre-hearing conference.  *See* Pl.'s Ex. 3 (CPR Mass-Claims Protocol at 3).  Thereafter, the

results of the initial cases are given to a mediator who will try to resolve the remaining cases.

After a mediation period of 90 days, the parties "may choose to opt out of the arbitration process

and proceed in court with the remaining claims."  Pl.'s Ex. 3 (CPR Mass-Claims Protocol at 4).

There is no evidence at this point that those choosing to arbitrate will face inordinate delays.

## II.      DISCUSSION

A.      Legal Standard

The Federal Arbitration Act ("FAA") provides as follows:

> A written provision in . . . a contract evidencing a transaction
> involving [interstate] commerce to settle by arbitration a controversy
> thereafter arising out of such contract or transaction, or the refusal to
> perform the whole or any part thereof, or an agreement in writing to
> submit to arbitration an existing controversy arising out of such a
> contract, transaction, or refusal, shall be valid, irrevocable, and
> enforceable, save upon such grounds as exist at law or in equity for
> the revocation of any contract.

9 U.S.C. § 2.

In the instant case, it is debatable whether the contract at issue – the ICA – is one

evidencing a transaction involving interstate commerce.  According to DoorDash, the ICA falls

under the FAA because the agreement "involves transactions and communications over email and

the Internet" and "[c]ourts regularly apply the FAA" in such circumstances.  Mot. at 8.  But

arguably the ICA is more about local delivery (local food delivery, in particular) than anything

else.

The Court, however, need not decide this issue because DoorDash offers an independent

reason as to why the FAA governs in the instant case; even if there is no interstate commerce

connection, the ICA expressly provides that the FAA governs the agreement.  *See* Tang Decl., Ex.

B (§ XI.1) ("This arbitration agreement is governed by the Federal Arbitration Act (9 U.S.C. §§ 1-

16) ('FAA') . . . .").  *See, e.g.*, *Victrola 89, LLC v. Jaman Props. 8 LLC*, 46 Cal. App. 5th 337, 355

(2020) (stating that "the presence of interstate commerce is not the only manner under which the

FAA may apply[;] the parties may also voluntarily elect to have the FAA govern enforcement of the Agreement, as they did here"); *see also Ramirez v. LQ Mgmt., L.L.C.*, No. 2:19-CV-06507-ODW (JPRx), 2020 U.S. Dist. LEXIS 93975, at *5 n.3 (C.D. Cal. May 29, 2020) (holding that the FAA applies "based on the Agreement's express invocation of the FAA and the nature of Ramirez's employment"); *Martinez v. Leslie's Poolmart, Inc.*, No. 8:14-cv-01481-CAS(CWx), 2014 U.S. Dist. LEXIS 156218, at *8-9 n.4 (C.D. Cal. Nov. 3, 2014) (holding that the FAA's interstate commerce requirement was satisfied but also noting that "the arbitration agreement expressly provides that it is governed by the FAA"); *In re VeriSign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1224 (N.D. Cal. 2007) (stating that "[t]he FAA governs the issue of arbitrability here because the agreement expressly so provides and because the agreement involves interstate commerce").  Notably, Plaintiffs do not challenge DoorDash's contention that the FAA governs.

B.    Contract Formation

As noted above, DoorDash asks that the Court compel arbitration for the vast majority of individuals who have filed consent forms (*i.e.*, opted into this lawsuit).  In response, Plaintiffs argue first that the Court should deny the motion because DoorDash has failed to provide evidence that it entered into an arbitration agreement with any of these individuals in the first place.  *See Norcia v. Samsung Telcoms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017) (noting that "the party seeking to compel arbitration . . . bears 'the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence'").

Plaintiffs' argument is one of contract formation and thus is proper for this Court to address.  *See Kum Tat Ltd. v. Linden Ox Pasture, LLC*, 845 F.3d 979 (9th Cir. 2017) (stating that, "[a]lthough challenges to the validity of a contract with an arbitration clause are to be decided by the arbitrator [based on a delegation clause], challenges to the very existence of the contract are, in general, properly directed to the court").  The problem for Plaintiffs is that DoorDash has offered evidence that there are arbitration agreements.  In a nutshell, an individual cannot become a Dasher without signing up and, as part of the sign-up process, she is required to agree to the ICA, which includes an arbitration provision.

Plaintiffs assert that their position is supported by *In re Uber Text Messaging*, No. 18-cv-

United States District Court
Northern District of California

02931-HSG, 2019 U.S. Dist. LEXIS 102007 (N.D. Cal. June 18, 2019), but that case is distinguishable.  In *Uber*, the plaintiffs brought a class action against Uber alleging that it violated the TCPA when it sent them unsolicited text messages.  *See id.* at *2.  Uber moved to compel arbitration.  According to Uber, one of the plaintiffs agreed to arbitration when he registered for Uber on a mobile app and requested a trip on the same day.  *See id.* at *21-22.  The court, however, noted that the plaintiff expressly declared under oath that he did not recall ever completing the Uber registration process or ordering a ride.  The plaintiff further testified that his cell phone lacked the technological capability to download the Uber app.  *See id.* at *23.  The court therefore declined to grant the motion to compel arbitration "based on the present record." *Id.* at *25 (noting that there was a genuine dispute of fact and Uber had the burden of proving the existence of the agreement to arbitrate).

The instant case is distinguishable from *Uber* because here, unlike *Uber*, Plaintiffs have not offered declarations from the approximately 4,000 "opt-in" plaintiffs disputing that they entered into arbitration agreements with DoorDash.  Plaintiffs have presented no authority holding that under the circumstances of this case – where the Dasher must click the box indicating consent to the ICA which is readily accessible via visible hyperlink – there is no agreement.

Plaintiffs maintain still that there are some individuals who have opted out of arbitration, as permitted by the arbitration agreement.  *See* Pl.'s Ex. 1 (identifying four individuals other than Mr. McGrath).  But DoorDash has not disputed that there are some individuals who validly opted out; DoorDash seeks to compel arbitration only for those who did not validly opt out.

C.      FAA Exemption from Arbitration

Plaintiffs argue next that, even if there were agreements to arbitrate (with respect to contract formation), the individuals cannot be compelled to arbitrate under the FAA because the FAA contains an exemption.  Title 9 U.S.C. § 1 provides that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, *or any other class of workers engaged in foreign or interstate commerce*."  9 U.S.C. § 1 (emphasis added).  The Supreme Court has held that the phrase "any other class of workers engaged in foreign or interstate commerce" means transportation workers engaged in such commerce.  *See Circuit City Stores v. Adams*, 532

1  U.S. 105, 119 (2001) (stating that "Section 1 exempts from the FAA only contracts of

2  employment of transportation workers").  Whether Dashers are transportation workers engaged in

3  foreign or interstate commerce is an issue for the Court to decide, and not the arbitrator.  *See Van*

4  *Dusen v. United States Dist. Court for the Dist. of Ariz.*, 654 F.3d 838, 843-44 (9th Cir. 2011)

5  (agreeing with petitioners that "the issue of whether a Section 1 exemption is not a 'question of

6  arbitrability' that parties can legally delegate to an arbitral forum"; "a district court has no

7  authority to compel arbitration under Section 4 where Section 1 exempts the underlying contract

8  from the FAA's provisions").

9          In support of the argument that Dashers are a class of transportation workers engaged in

10  interstate commerce, Plaintiffs point to declarations that were submitted in support of the motion

11  for preliminary or conditional certification.  Plaintiffs submitted about 22 declarations from

12  Dashers in support of the motion for conditional certification.  About 19 of those declarations

13  include the following testimony:

> DoorDash permits its "partner" restaurants to solicit completion of
> deliveries of food productions within a 25-mile radius of each such
> restaurant.  Consequently, if I were to make deliveries from a
> restaurant that bordered another state within that 25-mile radius, I
> could be called upon to make deliveries in interstate commerce.  I
> reasonably expected that if a consumer in one state used the
> DoorDash app to place an order for delivery from a restaurant in
> another state, but also within a 25-miles radius of that consumer, I
> would be required to complete the delivery by crossing state lines or
> I would not receive pay.

20  *See, e.g.*, Docket No. 48-1 (Barragan Decl. ¶ 13).

21          The remaining 3 Dasher declarations contain the same testimony, *plus* additional testimony

22  that they did, in fact, cross state lines "on several occasions."  Docket No. 48-1 (Cullen Decl. ¶ 14)

23  ("In fact, on several occasions, I crossed state lines to make deliveries from a restaurant in one

24  state to a consumer in another state.  I traveled from Maryland to Pennsylvania and Delaware.");

25  Docket No. 48-1 (Schratt Decl. Decl. ¶ 14) (same); Docket No. 48-1 (Shade Decl. ¶ 13) ("In fact,

26  on several occasions, I crossed state lines to make deliveries in one state to a consumer in another

27  state.  I traveled from Delaware to Maryland and Pennsylvania.").

28          The above thus indicates that crossing state lines was theoretically possible for Dashers but

United States District Court
Northern District of California

most Dashers did not cross state lines and those who did cross state lines did so only "on several occasions."

This Court previously addressed the same basic factual scenario in *Capriole v. Uber Techs., Inc.*, No. 20-cv-02211-EMC, 2020 U.S. Dist. LEXIS 90687, at *19 (N.D. Cal. May 13, 2020). There, the Court began its analysis by noting that the plaintiffs had to establish that the § 1 exemption applied and that "[t]he Supreme Court has counseled that the exception is to be interpreted narrowly." *Id.* at *20. Regarding the latter, the Court contrasted the language used for the § 1 exemption ("engaged in interstate commerce") with the language used in § 2 for applicability of the FAA ("involving commerce," *i.e.*, affecting commerce). The plaintiffs in *Capriole* argued that they were "engaged in commerce" because, *e.g.*, "Uber drivers sometimes cross state lines while transporting passengers." *Id.* at *21.

The Court noted that "the relevant inquiry is not whether an individual driver has crossed state lines" (only one plaintiff had alleged he had done so) but rather "whether the *class* of drivers crosses state lines." *Id.* at *22 (emphasis in original). And "[o]n that point, Uber has provided evidence that only 2.5% of 'all trips fulfilled using the Uber Rides marketplace in the United States between 2015 and 2019 . . . started and ended in different states.'" *Id.* Although "[a] small number of courts have concluded that when transportation workers occasionally cross state lines, they may be 'interstate transportation workers within the meaning of § 1 of the FAA,'" *Id.* at *23 (quoting *Int'l Bhd. of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954, 957 (7th Cir. 2012)), the Court ultimately sided with those courts that had held to the contrary. *See id.* at *26 (citing, *inter alia*, *Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904 (N.D. Cal. 2007)). The Court indicated that it found persuasive the following reasoning: (1) finding that the § 1 exemption would apply whenever business dealings crossed state lines would threaten to swallow the general policy of enforcing arbitration agreements and (2) Supreme Court authority (*United States v. Yellow Cab Co.*, 332 U.S. 218 (1947)) suggested that a casual and incidental relationship to interstate transit would not be sufficient to invoke the § 1 exemption. *See also Hill v. Rent-A-Center, Inc.*, 398 F.3d 1286, 1289-90 (11th Cir. 2005) (stating that "[t]here is no indication that Congress would be any more concerned about the regulation of the interstate transportation

11

activity incidental to Hill's employment as an account manager, that it would in regulating the interstate 'transportation' activities of an interstate traveling pharmaceutical salesman who incidentally delivered products in his travels, *or a pizza delivery person who delivered pizza across a state line to a customer in a neighboring town*.") (emphasis added); *Levin v. Caviar, Inc.*, 146 F. Supp. 3d 1146, 1154 (N.D. Cal. 2015) (noting that "a strike by local delivery drivers" would not, "by virtue of a strike, 'interrupt the free flow of goods to third parties *in the same way that a seamen's strike or railroad employee's strike would*'") (emphasis added).

In light of this Court's ruling in *Capriole*, Plaintiffs' argument that the § 1 exemption is applicable here lacks merit.[6] There is no indication that Dashers cross state lines to make deliveries significantly more often than do Uber drivers who cross state lines to transport passengers.

Moreover, the Ninth Circuit's recent decision in *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904 (9th Cir. 2020), confirms this result. In *Rittmann*, the Ninth Circuit held that delivery providers for Amazon's app-based delivery program, Amazon Flex (AmFlex) – who "occasionally cross state lines to make deliveries" but mostly make in-state deliveries – *did* fall within the § 1 exemption. *Id.* at 907. But this was because the goods delivered by AmFlex workers did not

> originate in the same state where deliveries take place. Rather, AmFlex workers pick up packages that have been distributed to Amazon warehouses, certainly across state lines, and transport them for the last leg of the shipment to their destination. Although Amazon contends that AmFlex delivery providers are "engaged in local, intrastate activities," the Amazon packages they carry are goods that remain in the stream of interstate commerce until they are delivered.

*Id.* at 915. Notably, in holding that the delivery providers did fall within the § 1 exemption, the Ninth Circuit expressly found

> cases involving food delivery services like Postmates or Doordash . . . distinguishable. Those cases recognize that local food delivery drivers are not "engaged in the interstate transport of goods" because the prepared meals from local restaurants are not a type of good that are "indisputably part of the stream of commerce."

---

[6] The Court acknowledges that *Capriole* is on appeal.

United States District Court
Northern District of California

*Id.* at 916 (citing approvingly the Seventh Circuit's decision in *Wallace v. Grubhub Holdings, Inc.*, No. 19-1564, 2020 U.S. App. LEXIS 24494 (7th Cir. Aug. 4, 2020), which held that Grubhub drivers – who do local restaurant food delivery – are not covered by the § 1 exemption).

At the hearing, Plaintiffs argued that *Rittmann* is not directly on point and that a more analogous case is, *Rogers*, 452 F. Supp. 3d at 916 (holding that "[t]he drivers, as a class, are not engaged in interstate commerce" because "[t]heir work predominantly entails intrastate trips"; "[a]lthough we can safely assume that some drivers (especially those who live near state borders) regularly transport passengers across state lines," "[i]nterstate trips that occur by happenstance of geography do not alter the intrastate transportation function performed by the class of workers"). Plaintiffs acknowledge that the trial court ruled against the drivers in *Rogers*. However, they note that the case has been appealed, and they assert that, if the Court is inclined to rule against application of the § 1 exemption as the *Rogers* trial court did (and as this Court did in *Capriole*), then it should stay the proceedings here to see what happens to *Rogers* on appeal before the Ninth Circuit. This argument is unavailing. Plaintiffs never argued in their opposition brief for a stay because of the *Rogers* appeal – or for that matter the appeal in *Capriole*. The argument, therefore, has been waived. In any event, in light of *Rittmann*, it appears unlikely that plaintiff will prevail in either *Rogers* or *Capriole* on this issue.

D.     Partiality of Arbitrator

Plaintiffs argue next that, even if the § 1 exemption is not applicable, there is still a basis to reject arbitration for (1) individuals who signed up with DoorDash on or after November 9, 2019 – *i.e.*, those subject to the most recent ICA – or (2) those who previously signed up with DoorDash but, when prompted, accepted the terms of the most recent ICA.

Plaintiffs note that, with the most recent ICA, DoorDash dropped AAA and moved over to CPR. *Compare, e.g.*, Tang Decl., Ex. D (§ XI) (providing that "[t]he arbitration shall be heard by one arbitrator selected in accordance with the AAA Rules" and the arbitration shall be governed by the AAA Commercial Arbitration Rules), *with* Tang Decl., Ex. E (§ XI) (providing that "[t]he arbitration shall be heard by one arbitrator . . . selected in accordance with the CPR Rules" and "[a]ny arbitration shall be governed by the CPR Administered Arbitration Rules and, when

applicable, the CPR Employment-Related Mass-Claims Protocol").  According to Plaintiffs,

DoorDash did this to deprive Dashers from a fair and impartial forum.  Mr. McGrath notes that

there is evidence that DoorDash worked together with CPR to create the Mass-Claims Protocol, as

indicated through discovery taken in a case against DoorDash in which Judge Alsup was the

presiding judge.  The following is an excerpt from one of Judge Alsup's orders in that case:

> The materials sought to be sealed here all relate to email
> communications between CPR and [DoorDash's] counsel, Gibson
> Dunn, in 2019.  In short, the emails track the following events: in
> May 2019, Gibson Dunn reached out to CPR to discuss issues
> DoorDash was having with filing fees for mass arbitrations, and to
> find a solution to prevent "an abuse of process."  In October 2019,
> CPR provided Gibson Dunn with a draft of a mass arbitration
> protocol for discussion.  A week later, CPR provided Gibson Dunn
> with another draft of the protocol based on their discussion.  Gibson
> Dunn "interlineated comments, questions, and recommendations" in
> the new draft.  CPR and Gibson Dunn traded additional drafts and
> revisions in the following weeks. On November 4, CPR notified
> Gibson Dunn that it had posted the finalized new protocol and asked
> to be notified when the new DoorDash contracts providing for
> arbitration under CPR were distributed.

*Abernathy v. DoorDash, Inc.*, No. C-19-7545 WHA (N.D. Cal.) (Docket No. 177) (Order at 7).

Plaintiffs then argue that the Mass-Claims Protocol is problematic because,

> now, when mass arbitrations are filed in arbitration (more than 30
> cases filed by one law firm), CPR will bellwether up to 10 of those
> cases at a time.  Consequently, this protocol would force the
> thousands of the Opt-In Plaintiffs in this case (if compelled to
> arbitration with CPR) to delay their arbitration demand for years,
> while they wait their turn in the "queue."

Opp'n at 16-17.

As a preliminary matter, the Court must consider whether Plaintiffs have raised an issue

for this Court to decide or whether the issue should be decided by the arbitrator because of the

delegation clause in the arbitration agreement.  *See* Tang Decl., Ex. E (§ XI) (providing that, other

than the arbitration class action waiver, "[a]ll other disputes with respect to whether this Mutual

Arbitration Provision is unenforceable, unconscionable, applicable, valid, void or voidable, and all

disputes regarding the payment of arbitrator or arbitration-organization fees including the timing

of such payments and remedies for nonpayment, shall be determined exclusively by an arbitrator,

and not by any court").

14

United States District Court
Northern District of California

1    Plaintiffs argue that the issue is for the Court because it is one of contract formation.

2  According to Mr. McGrath, contract formation is at issue because, where there is an agreement to

3  arbitrate, presumptively, the parties are agreeing to a fair and impartial arbitral forum; if there is

4  no fair and impartial arbitral forum, then there is no agreement to arbitrate in the first place. *Cf.*

5  *Hooters of America, Inc. v. Phillips*, 173 F.3d 933, 940 (4th Cir. 1999) (noting that "parties agreed

6  to submit their claims to arbitration – a system whereby disputes are fairly resolved by an

7  impartial third party"; rescinding the contract since the process was not impartial thus defeating

8  the object of the contracting parties).

9    Plaintiffs' position, however, is not persuasive as a factual matter.  While Plaintiffs have a

10  fair concern about Gibson Dunn's initiating contact with CPR and its involvement in the

11  development of the Mass-Claims Protocol (which might give rise to a systemic bias), the record in

12  *Abernathy* indicates that CPR did not work with Gibson Dunn exclusively and that Gibson Dunn

13  did not otherwise control the development of the Protocol.  In discovery responses, CPR explained

14  that,

15    [i]n developing the Protocol, [it] invited and received input from a
variety of stakeholders.  These stakeholders included labor and
16    employment counsel with experience representing management and
employees on an individual and class basis, and attorneys with mass
17    claims, complex commercial litigation, and arbitration experience,
some of whom are also prominent arbitrators and mediators,
18    including one of the foremost experts in facilitating the resolution of
mass claims.  CPR also consulted with particular members of its
19    Board of Directors, who have served as an advisor to ALI's
Restatement of Employment Law and who have chaired the New
20    York Chief Judge's Advisory Committee on Alternative Methods of
Dispute Resolution.  While advising from the outset that the
21    Protocol was being developed for the broader marketplace and to
balance the interest of all parties, CPR received input from Gibson
22    Dunn and in-house counsel at DoorDash to gain their perspective on
the practical application of the Protocol, and whether and how the
23    new approach improved upon the current market options available
for resolving mass arbitration claims.
24
    . . . Gibson Dunn did not write the terms of the Protocol.  Rather, as
25    set forth above, it was CPR that conceived of, wrote the terms of,
and controlled the development of the Protocol.
26

27  Holocek Decl., Ex. E (CPR responses to subpoena in *Abernathy v. DoorDash, Inc.*, No. C-19-

28  7545 WHA (N.D. Cal.)).  It thus appears that the Mass-Claims Protocol is offered to the market –

*i.e.*, it is not a one-off protocol tailored to DoorDash but is openly available to other companies.

Furthermore, even though Gibson Dunn's involvement in the development of the Mass-Claims Protocol may raise some concern, the ultimate question is whether the Protocol is fair and impartial – *i.e.*, one that is not predisposed more favorably to Gibson Dunn, its clients (including DoorDash), or defendants generally compared to other generally accepted conventional arbitration rules.  At least as a facial matter, the Court is hard pressed to see any such catering or favoritism.  There is little concrete evidence to support Plaintiffs' argument that the Mass-Claims Protocol would result in significant delay in resolution of the Dashers' claims.[7]  In addition, the terms of the Mass-Claims Protocol appear fair.  For example, the test cases are chosen randomly, and the claimant has a greater role in selecting the arbitrator than the respondent (the respondent can only object).  Also, the respondent pays for the mediation fees in the mediation process that follows the test cases.  Most important, after the mediation process, a claimant can choose to opt out of the arbitration process and go back to court – an option not generally available under, *e.g.*, AAA rules. *See* Pls.' Ex. 3 (CPR Mass-Claims Protocol at 3-4); *see also* Holocek Decl., Ex. G (in *Abernathy* case, CPR providing deposition testimony that Gibson Dunn and others provided feedback but, "[a]t the end of the day, that protocol was ours" and "there were things they, perhaps, didn't like in the protocol" – *e.g.*, "we built in a back-end opt-out procedure, something that they did not – they very much did not want"; "[t]his was for the general marketplace").

The Court therefore rejects Plaintiffs' contract formation argument.  The Protocol is not so biased that it negates the agreement to arbitrate.  The Court does not address any argument that Plaintiffs may have on unconscionability as that would be a matter for the arbitrator to decide based on the delegation clause in the arbitration agreement.  *See* Tang Decl., Ex. E (§ XI) (providing that, other than the arbitration class action waiver, "[a]ll other disputes with respect to whether this Mutual Arbitration Provision is unenforceable, unconscionable, applicable, valid,

---

[7] As noted above, the initial 10 test cases are generally to be resolved within 120 days of the initial pre-hearing conference.  *See* Pls.' Ex. 3 (CPR Mass-Claims Protocol at 3).  Thereafter, the results of the initial cases are given to a mediator who will try to resolve the remaining cases.  After a mediation period of 90 days, the parties "may choose to opt out of the arbitration process and proceed in court with the remaining claims."  Pls.' Ex. 3 (CPR Mass-Claims Protocol at 4).

United States District Court
Northern District of California

1    void or voidable, and all disputes regarding the payment of arbitrator or arbitration-organization

2    fees including the timing of such payments and remedies for nonpayment, shall be determined

3    exclusively by an arbitrator, and not by any court"). The Court also expresses no opinion here as

4    to whether Plaintiffs could have a post-arbitration argument that the arbitration decision should be

5    vacated because of a lack of impartiality on the part of the arbitrator.

6    E.    DoorDash's Address

7         Finally, Plaintiffs argue that the arbitration agreement may be voidable because DoorDash

8    has made misrepresentations about which address a Dasher should use to send notice that she is

9    opting out of arbitration. Plaintiffs note that, in the ICA provided in support of the motion to

10   compel, the following address is used: 901 Market Street, Suite 600, San Francisco, California

11   94103. *See, e.g.*, Tang Decl., Ex. E (§ XI). However, on DoorDash's website, the posted ICA has

12   a different address: 303 2nd Street, Suite 800, San Francisco, California 94107.[8] *See* Arbuckle

13   Decl., Ex. 1 (§ XI). Plaintiffs assert that "[t]he opt-out notices of Opt-In Plaintiffs Derrick

14   Salmons, Lisa Benningfield, and Adrian Davis were all sent . . . to 303 2nd Street, Suite 800" and

15   expresses concern that DoorDash may try to claim that opt-outs sent to this address are invalid

16   because they were sent to the wrong address. Opp'n at 21.

17        This issue is moot.[9] DoorDash has acknowledged the opt-opts of the three individuals

18   identified above are valid. *See* Tang Reply Decl. ¶ 6 (testifying that the opt-out letters of Mr.

19   Salmons, Ms. Benningfield, and Mr. Davis are valid). DoorDash also confirms that opt-outs sent

20   to *either* address above will not be rejected on the basis that they opt-outs were sent to the wrong

21   place. *See* Tang Reply Decl. ¶ 7 (testifying that "DoorDash has honored, and will continue to

22   honor, any timely opt out letter that it receives regardless of whether it was originally addressed to

23   901 Market Street or 303 Second Street"). DoorDash has also provided evidence that there is a

24   non-nefarious reason for the two different addresses – *i.e.*, DoorDash recently moved office

25   _____

26   [8] According to Plaintiffs, they learned about the different address when they were monitoring
     DoorDash's webpage (which he does periodically). *See* Opp'n at 21.

27   [9] The Court acknowledges DoorDash's position the issue should technically be resolved by the
     arbitrator because of the delegation clause. But given the mootness of the issue, the Court
28   addresses the issue briefly, if only in the interest of moving the litigation forward.

locations.  *See* Tang Reply Decl. ¶ 7 (adding that "DoorDash has obtained mail forwarding . . . and has received opt-out letters sent to both addresses").

F.      Plaintiffs Who Validly Opted Out of Arbitration

For the foregoing reasons, the Court grants DoorDash's motion to compel to arbitration those Plaintiffs who did not validly opt out of the arbitration agreement.  As to which Plaintiffs validly opted out of the arbitration agreement, DoorDash does not dispute Plaintiffs' contention that Mr. McGrath, Mr. Salmons, Ms. Benningfield, and Mr. Davis all validly opted out.  Plaintiffs have claimed only one additional individual – Vickie Smiley – as an opt-out.  DoorDash challenges Ms. Smiley's opt out on the basis that she opted out via email, *see* Pls.' Ex. 1 (email from Ms. Smiley, dated November 11, 2018), but her arbitration agreement required that her opt-out notice be provided by mail.  *See* Tang Decl. ¶ 5 (testifying that Ms. Smiley accepted the ICA on November 13, 2018); Tang Decl., Ex. C (§ XI.8 of ICA in effect from October 22, 2018, through July 15, 2019) (requiring notice of opt-out to be mailed; "[a]ny attempt to opt out by email will be ineffective").

The Court finds Ms. Smiley's opt-out ineffective because she did not comply with requirements to opt out.  Admittedly, prior versions of the ICA allowed for email notice.  However, there is no indication that DoorDash changed the requirement from email notice to mail notice as a means to make opting out more difficult.  The Court also notes that Ms. Smiley was represented by counsel at the time she opted out.

### III.      CONCLUSION

DoorDash's motion to compel arbitration is granted.  Plaintiffs have offered evidence that only five individuals exercised the right to opt out.  Those opt-outs are all deemed valid, except for that submitted by Ms. Smiley.  Ms. Smiley and the remaining plaintiffs are all compelled to arbitration.  Their cases in this Court are also stayed pending arbitration.

As to Mr. McGrath, Mr. Salmons, Ms. Benningfield, and Mr. Davis, the Court shall proceed with their claims.  At this time, the Court administratively terminates the motion for conditional certification that was previously filed, *see* Docket No. 46 (motion), because events have significantly changed since that motion was filed, and the plaintiffs who are proceeding here

United States District Court
Northern District of California

indicated that they would likely want to file a new motion for conditional certification.

The Court sets a status conference for December 3, 2020 at 10:30 a.m.  A joint status conference statement shall be filed one week prior thereto.

This order disposes of Docket No. 116.


**IT IS SO ORDERED**.


Dated: November 5, 2020

_____
EDWARD M. CHEN
United States District Judge